✓ FILED ___ ENTERED
___ LOGGED ____ RECEIVED

11:12 am, Mar 25 2021
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **INFORMATION ASSOCIATED WITH TWO FACEBOOK ACCOUNTS WITH THE USER ID #s 1442451281 AND 233600273346186 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC.** | **Misc. No.**  1:21-mj-654 TMD |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Eugene H. Choi, being first duly sworn, hereby deposes and states as follows:

### INTRODUCTION AND AFFIANT'S BACKGROUND

1.      I am a Special Agent with the Office of Inspector General - Department of Defense, Defense Criminal Investigative Service (hereafter referred to as DCIS), and I have held that position since August 11, 2003.  I have completed training related to white-collar crime and investigative techniques at the Federal Law Enforcement Training Centers (FLETC) in Glynco, Georgia and Charleston, South Carolina, and I have also attended other conferences and symposiums for experienced white-collar crime investigators.  I have participated in numerous investigations involving various kinds of fraud over the course of the past 17 years.  I have been the affiant on search and seizure warrants for electronic media storage devices and email service providers, and I have executed numerous searches, arrests, and seizure warrants involving all types of fraud schemes, including time-and-attendance fraud by government contractors.  With respect to the technical aspects of these matters, I have attended several training courses, which included training on internet-based fraud schemes at the FLETCs in Glynco, Georgia and Charleston, South Carolina.  In several investigations, I have consulted with cyber professionals

1

in law enforcement regarding the evidentiary value of computers and mobile phones in conjunction with wireless and email servers during my drafting of search warrants for digital media storage devices.

2.     This affidavit is made in support of an application for a search warrant submitted pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).   This application requests that this Court issue a search warrant for information associated with certain accounts that are stored at premises controlled by Facebook, Inc. (Facebook), a social media and electronic communications services provider with offices located at 1601 Willow Road, Menlo Park, CA 94025.  The requested search warrants would require Facebook to disclose to the government copies of the information (including the content of communications) contained in the accounts listed in Attachment A, as further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.     This investigation focuses on an alleged scheme to defraud the federal government, specifically the National Security Agency (NSA), of approximately $300,000 (and possibly substantially more).  As set forth in more detail below, the investigators received information that Ms. Jacky Kimmel, the owner and Chief Executive Officer (CEO) of an information technology (IT) services company named InfoTeK, caused InfoTeK to submit monthly invoices to the NSA's Maryland Procurement Office (MPO) from at least April 2016 through October 2017 that fraudulently inflated the hours worked by Ms. Kimmel as the Senior Program Manager on a contract named IRONBRIDGE that InfoTeK had with the NSA.  (The government also has reason to believe that this overbilling was also occurring with Ms. Kimmel's knowledge prior to March 2016, when another InfoTeK employee held the Senior Program Manager position on the IRONBRIDGE contract.)  Your Affiant understands that time-

2

and-attendance fraud occurs when a company and/or an employee or contractor of a company that has a government contract knowingly submits timesheets or bills for work hours that were not performed, causing the company and/or its employee or contractor to be overpaid paid for work that was not done, and thereby resulting in a financial loss to the government.

4.     On Thursday, February 25, 2021, a federal grand jury in this district returned an indictment arising out of this investigation that charged Ms. Kimmel with 19 counts of violations of 18 U.S.C. § 287 (submission of false claims to the NSA) and one count of violating 18 U.S.C. § 1001(a)(2) (making false statements to NSA investigators). *United States v. Jacky McComber*, Crim. No. ELH-21-036 (D. Md.). Investigators have already obtained some screenshots of relevant images from the pages of InfoTek's Facebook account (copies attached to this affidavit). This search warrant is sought to further authenticate these images; to obtain other possible images from the InfoTeK corporate Facebook account; and to obtain potentially relevant images from Ms. Kimmel's personal Facebook account, which were not otherwise visible or available to investigators as a result of the account's apparent privacy settings.

### *Individuals and Entities Who are Relevant to this Affidavit*

5.     Ms. Jacky Kimmel (Kimmel)[1] is the CEO, President, and the sole owner of InfoTeK Corporation (InfoTeK), whose website currently lists its principal place of business as 7240 Parkway Drive, Hanover, Maryland 21076.

6.     InfoTeK is a company that is engaged in the business of providing IT support to federal government agencies and private companies. InfoTeK was previously co-owned by Ms. Kimmel and her first husband, Robert Kimmel. They divorced in approximately 2016, and as

---

[1]   In April 2019, which is after the period at issue in this investigation, Ms. Kimmel remarried, and she is now known as Jacky McComber.

part of the divorce settlement, Ms. Kimmel became the sole owner of InfoTeK in the late summer of 2016. As part of the financial settlement between Jacky and Robert Kimmel, InfoTeK is paying Robert Kimmel approximately $17,000 a month towards a total agreed payment of $3 million to compensate him for his prior ownership share in the company.

    7.    During the time period between March 2016 and September 2017, which is relevant to this investigation, Ms. Kimmel and InfoTeK utilized the following social media accounts, among others:

    (a)    **Facebook Account (Jacky Kimmel): User ID:** 1442451281 (User Name: Jacky McComber) (information specific to this account can be found in paragraphs 24-26); and

    (b)    **Facebook Account (InfoTeKCorporation): User ID: 233600273346186** (User Name: Jacky McComber) (information specific to this account can be found in paragraphs 27 and 46-55).

    8.    I was first assigned to this investigation in January 2019. I have participated in this investigation personally, including meetings and interviews with witnesses; I have received information from other federal and local law enforcement and intelligence officials relating to this investigation; and I have also reviewed records received from InfoTeK as part of its compliance with grand jury subpoenas issued during this investigation. The information set forth in this Affidavit is thus based both on my own observations and review of documents, and on reliable information provided to me by other law enforcement personnel. I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested search warrant. However, I have not knowingly omitted any fact that I believe might tend to defeat a finding of probable cause. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

4

9.     Based upon my training and experience and the facts as set forth in this affidavit, your Affiant submits that there is probable cause to believe that fraudulent claims involving time-and-attendance were submitted or caused to be submitted to the NSA by InfoTeK and Ms. Kimmel, and that false statements to government investigators were made by Ms. Kimmel, in violation of 18 U.S.C. §§ 287 and 1001, and that evidence of these crimes will be found in the social media accounts described above and in Attachment A.  There is accordingly probable cause to search the accounts described in Attachment A for evidence of these crimes, as further described in Attachment B.

## JURISDICTION

10.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, and 18 U.S.C. §§ 2703(b)(1)(A) & (c)(1)(A).  Specifically, according to 18 U.S.C. § 2711(3)(A)(i), the Court is "a district court of the United States . . . that . . . has jurisdiction over the offense being investigated."

## FACEBOOK AND ITS SERVICES

11.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, which can then be used to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also

assigns a user identification number to each account.

12.     A Facebook user can connect directly with other individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13.     Facebook users can select different privacy setting for the communications and information associated with their Facebook accounts. By adjusting these settings, a Facebook user can restrict information only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.

14.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" from particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

15.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also

provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

16.     Facebook users can exchange private messages on Facebook with other users using an application called Facebook Messenger. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account.

17.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

18.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

7

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

19.     Facebook also retains IP logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including the type, date, and time of the action, and the user ID and IP address associated with the action.

20.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).

21.     Information stored in connection with a Facebook account may therefore provide crucial evidence relating to the criminal conduct under investigation.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can establish who has used or controlled the Facebook account.

22.     Facebook account activity can show how and when the account was accessed or used.  For example, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can establish the chronological and geographic context of the account access and use relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may either inculpate or exculpate the Facebook account owner with regard to the matters that are the subject of a criminal investigation.

23.     Facebook account activity may provide relevant insight into the Facebook account owner's state of mind with regard to the offense under investigation.  Information on the

8

Facebook account may indicate the owner's motive and intent to commit a crime, or establish their consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

## KIMMEL'S AND INFOTEK'S FACEBOOK ACCOUNTS

24.     In early December 2020, investigators served a grand jury subpoena on Facebook requesting information concerning accounts in the names of either Jacky Lynn Kimmel (now McComber) or InfoTeK.  On or about December 21, 2020, Facebook responded through Custodian of Records Anne Hetherington that Jacky Kimmel with User ID 1442451281 had registered with Facebook and established an account on or about August 22, 2008.  The two emails associated with the account are:  jackykimm4@gmail.com and jacky@infotekcorp.com.

25.     On February 10, 2021, your Affiant requested that Investigative Analyst (IA) Rachel Varelas of the DCIS Southwest Field Office, who is an approved social media content reviewer for DCIS, conduct a covert search for any and all social media accounts connected to Jacky Kimmel under the name "Jacky McComber" on the social media platform known as Facebook.

26.     On February 10, 2021, IA Varelas logged into Facebook using a DCIS-approved Facebook account.  The results of IA Varelas's search yielded one public Facebook account under the name "Jacky McComber".  IA Varelas reviewed the contents of the Facebook account "Jacky McComber" and provided SA Choi with the following information through screenshots. Kimmel's "Jacky McComber" Facebook page shows her as having been a member of Facebook since August 2008.  There is one profile photograph, which your Affiant recognizes to be a photograph of Jacky Lynn Kimmel or McComber.  There are two publicly listed (and therefore visible) posts, one on August 30, 2017 displaying a picture of what appears to be a body of water

9

with a dock (which may well depict a property that Ms. McComber owns at 120 Alview Terrace in Glen Burnie, Maryland that has frontage on Marley Creek), and one on September 28, 2020 in which McComber announced two recent successes achieved by Infotek. Her page further reflects a total of 1,021 publicly listed Facebook friends, which suggests that this account has been actively used and maintained for at least some period of time.

27.     On or about December 21, 2020, Facebook also responded through Custodian of Records Anne Hetherington that a person named Sarah Dabney had registered with Facebook and established an account for InfoTeKCorporation with User ID 233600273346186 on or about June 1, 2005. As explained in paragraphs 46-55 below, your Affiant has since reviewed InfoTeK's Facebook page online and observed a number of posts and photographs there that contained information that was relevant to this investigation, several of which are attached as exhibits to this affidavit. These photographs sometimes depicted Ms. Kimmel/McComber.

## PROBABLE CAUSE

### *The Anonymous Complainant's August 2017 Letter Concerning Ms. Kimmel*

28.     Upon joining the investigation, your Affiant learned that on August 30, 2017, the NSA – Office of Inspector General (hereafter referred to as the NSA OIG) received a written but anonymous complaint from a self-identified whistleblower alleging that Ms. Kimmel, through InfoTeK, was billing the NSA under contract number H98230-11-C-1496 (the IRONBRIDGE contract) for time she did not actually work.

29.     Your Affiant learned that the IRONBRIDGE contract was a Fort Meade-based IT support contract that was originally awarded to InfoTeK on July 1, 2011. The contract's term was extended on a number of occasions and ultimately ran through early 2018. The total amount that InfoTeK billed to the NSA over the life span of this contract was in excess of $15 million.

30.     The IRONBRIDGE contract required InfoTeK to provide technical support to the National Security Operations Center (NSOC) at the NSA's facility at Fort Meade, Maryland. The IRONBRIDGE contract stipulated that all work performed in support of the contract had to be conducted within the designated NSA facility at Fort Meade. The NSA facility, OPS1, at which the InfoTeK personnel, including Kimmel, and its hired contractors were supposed to do their work in support of the IRONBRIDGE contract were access-restricted by use of access control cards that were provided to the InfoTeK employees and the contractors it hired. Their usage of these access control cards was tracked and recorded by the NSA on an ongoing basis throughout the duration of the IRONBRIDGE contract.

31.     InfoTeK billed the NSA for its services on a monthly basis, based on the number of hours worked by its employees and the outside independent contractors it hired, at previously approved hourly rates. While the monthly invoices submitted by InfoTek to the NSA's MPO merely listed the employees, their billing rates, the total number of hours they purportedly worked, and the resulting charges, the investigators have also obtained the underlying time records from InfoTeK that reflect the hours billed by Ms. Kimmel to the IRONBRIDGE contract on a daily basis. From March 15, 2016 through October 31, 2016, Ms. Kimmel's hourly labor rate charged to the NSA under the IRONBRIDGE contract was $148.12. From November 1, 2016 through September 28, 2017, Ms. Kimmel's hourly labor rate charged to the same contract was $150.35.

32.     The anonymous complainant who submitted the letter received by the NSA on August 30, 2017 claimed that Ms. Kimmel, who filled the position of Senior Program Manager on the IRONBRIDGE contract starting in mid-March, 2016, billed 75-100% of her hours to that contract even while on vacation, conducting other InfoTeK business in her capacity as the company's CEO and President, or supporting other programs and business development

11

activities for InfoTeK. Your Affiant learned that the NSA OIG obtained Ms. Kimmel's building

access control records and compared those against her timecard and billing records from

InfoTeK for the time period from March 15, 2016 through September 28, 2017. This

examination revealed a number of discrepancies that provided substantiation for the

complainant's allegations.

*The NSA OIG's Comparison of Ms. Kimmel's NSA Access Records*
*Against InfoTek's Billings for Her Work and the Complainant's Allegations*

33.     The NSA OIG's comparison of Ms. Kimmel's facility access records with

InfoTeK's billings for her work as program manager over the period from mid-March 2016

through the end of September 2017 demonstrated that InfoTeK had represented that Ms. Kimmel

had worked (and accordingly billed) **2603.5 hours** on the IRONBRIDGE contract. Yet for the

same period, her NSA access records revealed that she had only been present at the NSA's

NSOC facility for **263 hours** – a discrepancy of **2,342.5 hours**, or roughly 90% less than the

number of hours InfoTeK billed for Ms. Kimmel. Yet because of the highly classified nature of

the work the IRONBRIDGE contract involved, Ms. Kimmel was required to use a secure

computer that was located on-site for any work relating to substantive aspects of the contract's

performance, and she was not permitted to remove documents containing classified material

from the NSOC facility.

34.     By further comparing Ms. Kimmel's NSA access records against the specific

dates cited in the anonymous complainant's letter, the NSA OIG investigators were able to

determine that its allegations had a substantial factual basis, as set forth in paragraphs 34-41

below.

35.     **April 10th, 11th, and 12th, 2017:** Ms. Kimmel reported working, and InfoTeK's

monthly invoice to the NSA included, 8 hours for time purportedly for each of these days (24

hours total) on the IRONBRIDGE contract, but she did not actually access the NSA premises on any of these dates. Instead, after she was confronted about this matter by NSA investigators in October 2017, Ms. Kimmel stated that she was visiting a friend in Texas on a vacation with her family on those dates (hotel records from the Palacio Hilton in San Antonio indicate that she stayed there for the night of April 10th), although she claimed she did some coordination and work with various members of her staff on the IRONBRIDGE contract on those dates. Her then-attorney claimed in November 2017 that she had actually worked one hour on April 10th; three hours on April 11th (when it appears she returned from Texas); and a full 8-hour day on April 12th on IRONBRIDGE matters, for a total of 12 hours – although he provided no supporting documentation. Ms. Kimmel did not report to the NSOC worksite again until April 13th.

36.     **May 12th, 2017:** Ms. Kimmel's time records reflected, and InfoTeK's monthly bill to the NSA included, 8 hours for this day on the IRONBRIDGE contract, but she did not access the NSA premises on this date. Instead, two on-line photos visible on InfoTek's Facebook page, one of which clearly shows Kimmel, establish that she participated in a charity golf tournament sponsored by PRAXIS in Pasadena, Maryland that day. Her then-attorney subsequently represented that she spent 8 hours on this day working on "overhead and business development," which essentially conceded that her work time that day was devoted to administrative activity as InfoTeK's CEO and marketing or community relations activity for the company, none of which was billable to the IRONBRIDGE contract.

37.     **May 15th, 2017:** Ms. Kimmel recorded, and InfoTeK's monthly bill to the NSA included, 8 hours worked on the IRONBRIDGE contract, but she did not access the NSA premises on that date. Instead, registration records and photographs establish that she participated in a political campaign fundraising golf tournament for the incumbent Howard County Executive Alan Kittleman that day in Glenwood, Maryland.   Her then-attorney

13

represented that she had actually spent 2 hours working on the IRONBRIDGE contract and an additional 6.5 hours on "Overhead and G&A" (General and Administrative), the latter of which would not be billable.  Her desk calendar reflects what appears to be a half-hour meeting at 10:00 a.m. relating to InfoTeK's effort to secure the IRONBRIDGE II contract, but that would also not be billable to the existing contract.

38.     Notably, after Ms. Kimmel departed access control at the NSA just before 3 p.m. on Tuesday, May 2nd, she did not report to the NSA's NSOC worksite again for the next 11 business days, until 8:30 a.m. on Thursday, May 18th.  Nevertheless, she and InfoTeK billed a total of 82 hours (amounting to $12,328.70) for her time in connection with the IRONBRIDGE contract for these dates.

39.     **May 19th, 2017:**  Ms. Kimmel was actually present at the NSA for 1 hour and 22 minutes, but she reported on her time records, and InfoTeK's monthly bill to the NSA included, 8 hours for this day on the IRONBRIDGE contract.  Her calendar reflects that she was supposed to attend an event for the Juvenile Diabetes Research Foundation at 12:30 p.m. and her then-attorney conceded that she was scheduled for a charity golf event, but he claimed she was unable to attend because of "Ironbridge project requirements."  However, an expense report item indicated that she had attended a "Leadership Planning" event at "On the Border," a Mexican Grill and Cantina located in Elkridge, Maryland that day.

40.     **June 5th, 2017:**  Ms. Kimmel's time records indicated, and InFoTeK's monthly bill to the NSA included, 8 hours for this day on the IRONBRIDGE contract, but she did not access the NSA premises on this date.  Instead, Ms. Kimmel's calendar reflected that she was scheduled to attend a charity event sponsored by former Washington Redskins football player Mark Moseley at 8:00 a.m. in northern Virginia, and her then-attorney conceded that she did so. He represented that she had spent 8 hours working on "Overhead and G&A" this day – whether

14

this refers to her time at the golf tournament is unclear – but he conceded that "None of this time was billable to IRONBRIDGE."

41.    **June 14th, 15th, and 16th, 2017:** Ms. Kimmel reported working, and InFoTeK's monthly bill to the NSA included, 8 hours for time purportedly for each of these days (for a total of 24 hours) on the IRONBRIDGE contract, but she did not access the NSA premises at all on any of these three days. Instead, she was in Augusta, Georgia for what the anonymous complainant characterized as CEO activity and business development activities in support of potential new work on other contracts. Ms. Kimmel's own calendar reflects a "VALDOSTA/Hahira Recruitment/Networking Trip" to Augusta. Her then-attorney conceded that she did not work three 8-hour days on the IRONBRIDGE contract, but claimed without providing any supporting documentation that on each of these three days, she spent 2 hours on the IRONBRIDGE contract and 6 hours on "Overhead and G&A," which he said consisted of "support[ing] INFOTEK's Georgia-based Maryland Procurement Office ("MPO") programs and staff."

42.    After leaving access control at 3:16 p.m. on Thursday, June 8th, Ms. Kimmel did not return to the NSOC website for three full weeks, until 8:05 a.m. on the morning of June 29th. However, InfoTeK billed the NSA for 106 hours of her time in connection with the IRONBRIDGE contract over 14 of the intervening business days, at a total cost of $15,937.10.

43.    **June 22nd and 23rd, 2017:** Ms. Kimmel recorded, and InfoTeK's monthly bill to the NSA included, 8 hours of time for each of these days (16 hours total) on the IRONBRIDGE contract, but she did not access the NSA premises on either day. Instead, the anonymous complainant indicated that she travelled to Virginia Beach, Virginia to participate in a high school class reunion. Her then-attorney subsequently conceded that this was true, but represented that she had nevertheless spent 8 hours working on IRONBRIDGE on Thursday the

15

22nd before leaving later than she had intended for Virginia Beach, and that on Friday June 23rd

she had spent 5 hours on "Overhead and G&A" related to "expanding INFOTEK's NAVSEA

support work in that area" (i.e., marketing activity), which was not billable to the IRONBRIDGE

contract.

44.   **June 26th and 27th, 2017:**  Ms. Kimmel recorded working, and InfoTeK's

monthly bill to the NSA included, 8 hours on the IRONBRIDGE contract for each of these days

(a total of 16 hours), but she actually did not access the NSA premises at all on either day.  Ms.

Kimmel's calendar reflects that she took both of these days as a "Personal day."  The

complainant's letter reported that she had attended a refinancing for her house on one of these

days, and her calendar reflected an appointment at 10:00 a.m. on June 26th for a "Closing."

45.   In addition, interviews conducted by the investigators with NSA employees who

worked on the matters serviced by the IRONBRIDGE contract and with the InfoTeK employees

and contractors who were assigned to it confirmed that Ms. Kimmel spent relatively little time at

the NSOC work location at the NSA.  These employees further stated that from their perspective,

Ms. Kimmel did not play a substantial role carrying forward the day-to-day work on the

IRONBRIDGE contract at the NSOC work location:

- Jason Doyle, an InfoTeK employee who was initially a senior web developer on

  the IRONBRIDGE contract before taking over as its technical lead in March

  2016, stated that after Ms. Kimmel became the Project Manager in March 2016,

  there was a short period of time when she made an effort to show up, but that this

  didn't last.  When she did come into the work space, he would observe her talk to

  employees and government personnel and then sit at her desk and log into email.

  He said that she did not do any direct technical mission-related work.  He stated

  that he did some of the work that should have been hers – such as speaking to

InfoTeK employees or contractors if the government personnel had an issue with their work – because she was not present. He stated that her absences were the subject of jokes and "rumblings" among the InfoTeK employees and contractors.

- Robert Cummins, an InfoTeK contractor who worked on IRONBRIDGE from December 2014 through March 2018, stated that he observed Ms. Kimmel at the NSOC about once a week or so. If he had questions about project-related matters, he took them up with either Mike Kemp or Jason Doyle, rather than with Ms. Kimmel. He did not recall any of the other employees on the contract ever looking for Ms. Kimmel, because the contractors all seemed to manage themselves.

- Jason Clark, an NSA employee who served as the contracting officer's representative, stated that Jason Doyle served as the technical lead for InfoTeK and was responsible for assigning the work to the other contractors and employees and ensuring that it was performed. He did not think that Ms. Kimmel's presence was necessary to make the contract run. He estimated that she came into the office for half to three-quarters of a day about three times a month, and that when she did so, she would check and respond to her email and meet with the government leads and InfoTeK employees.

- Debra Fisher, an InfoTeK contractor who began working on the IRONBRIDGE contract in 2015, stated that Ms. Kimmel was only present at the NSOC occasionally, but that nobody was looking for her in any case.

- Symantha Hennlein, another INFOTEK contractor who began working on the IRONBRIDGE contract in October 2016, recalled seeing Ms. Kimmel on occasion, but had no idea what her duties as the Program Manager were. She said

17

that she considered Jason Doyle to be the "stand-in" Program Manager since he was on-site every day and knew the answers to most questions. She described the team working on the IRONBRIDGE contract as "very self-sufficient" with little to no issues.

### *The Investigators' Review of Ms. Kimmel's Social Media and Other Online Accounts*

46.     On February 28, 2019, your Affiant and Senior Investigator (SI) Lori Hazenstab (hereafter referred to as SI Hazenstab) of the NSA OIG reviewed the public portions of Ms. Kimmel's and InfoTeK's social media accounts, as well as InfoTeK's website, to determine if there were any discrepancies between the days that Ms. Kimmel recorded working hours on the IRONBRIDGE contract and her stated and/or suggested whereabouts as derived from her or InfoTeK's social media accounts for those days. Also, your Affiant reviewed a series of Lync messages that Ms. Kimmel sent that were previously obtained by SI Hazenstab. Lync is a messaging service created by the Microsoft Corporation that allows users to do instant messaging with other Lync users, make audio and video calls, schedule and conduct meetings on the Lync platform among multiple users, set one's availability status, and share certain items. Paragraphs 46-55 detail a number of discrepancies that your affiant and SI Hazenstab discovered during this review after comparing Ms. Kimmel's hours submitted, her NSA facility access control records, her and InfoTeK's social media and website pages, and her Lync messages.

47.     For Friday, May 13, 2016, InfoTeK's monthly bill to the NSA included 8 hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, Ms. Kimmel did not access the designated NSA facility for the contract through her access control card. Your Affiant discovered from SI Hazenstab that on May 3, 2016, Ms. Kimmel had written a message to another user on Lync that stated: ". . . May 13 we will end up at McDoogles in GB

18

after the golf tournament," and also that on Monday, May 9, 2016, she wrote to another user: "Friday I am in golf tournament in the Dena." It is assumed here that by "Friday" Ms. Kimmel was referring to Friday, May 13, 2016. Additionally, InfoTeK's corporate Facebook account for May 13th shared a photo of what appeared to be a golf course from another Facebook account named Praxis Engineering, and posted the following: "Great day to participate in the 10th annual Praxis Engineering Charity Golf Tournament! #InfoTeK #Golf #RainyDays" (copy attached). InfoTeK's corporate Facebook page also contained the following post with a photograph that depicted Ms. Kimmel along with three others on May 14, 2016: "Great day for the INFOTEK team on the course yesterday at the 10th Annual Praxis Engineering golf outing." It is assumed that "yesterday" here refers to May 13, 2016.

48.    For Thursday, June 9, 2016, InfoTeK's monthly bill to the NSA included 8 hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract. But the NSA's access control records reflect that Ms. Kimmel was only present for just under 4 hours at the designated NSA facility.   Your Affiant discovered from SI Hazenstab, that on June 9, 2016, Kimmel had written a message to another user on Lync that stated: "having a backyard BBQ at our office from 2:30 – 6:30 today". Ms. Kimmel also advertised this gathering on her Twitter account. On the same day, Ms. Kimmel wrote another Lync message to another user: "good morning, I am out tomorrow" (i.e., Friday, June 10th), while another Lync message she sent that day stated that "I am out until Tuesday." A review of Ms. Kimmel's and InfoTeK's social media and other websites revealed that on a website called www.punchbowl.com, which is a free, web-based online invitations service and digital greeting cards site, it appeared that InfoTeK posted an invitation for a happy hour barbeque on Thursday, June 9, 2016 from 2:30 p.m. through 6:30 p.m. at its headquarters building in Hanover, Maryland.

49.     For Friday, June 10, 2016, InfoTeK's monthly bill to the NSA included 8 hours
for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, there was
no record of Ms. Kimmel accessing the designated NSA facility for the contract through her
access control card, and as indicated in the previous paragraph, she had indicated that day before
that she was expecting to be out of work on June 10th. Your Affiant discovered from SI
Hazenstab that on April 7, 2016, Ms. Kimmel had written a message to another user on Lync
stating that "I am going to Myrtle beach june 10-12 for a country music festival with my mom,
sisters and some friends." Your Affiant saw a hard copy of a flyer for the Carolina Country
Music Fest that was posted online on the website https://carolinacountrymusicfest.com.  The
flyer announced that the music fest would be taking place from June 10-12, 2016 in Myrtle
Beach, South Carolina.  Ms. Kimmel's own calendar reflects her being on "Vacation" on this day
and included an entry for a 10:30 a.m. airplane flight.

50.     For Thursday, June 16, 2016, InfoTeK's monthly bill to the NSA included 8
hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, Ms.
Kimmel did not access the designated NSA facility for the contract on that date with her access
control card.  Your Affiant reviewed the public portions of InfoTeK's Facebook page and
observed that on June 16, 2016, she posted a photograph of herself and three other individuals in
what appeared to be an outdoor setting, with the following caption: "So happy #INFOTEK could
be a party of the first Boeing Intelligence & Analytics Charity Golf Outing today at The Timbers
at Troy Golf Course to benefit the MAGIC Foundation."

51.     For Wednesday, August 10, 2016, InfoTeK's monthly bill to the NSA included 8
hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, Ms.
Kimmel did not access the designated NSA facility for the contract through her access control
card on that date at all.  Your Affiant reviewed the public portions of InfoTeK's Facebook page

and observed that on August 5, 2016, a photograph had been posted of what appeared to be an advertisement for a hiring event taking place on August 10, 2016 at the BWI Marriott in Linthicum Heights, Maryland. Similarly, InfoTeK billed 8.0 hours for Ms. Kimmel's time on August 11, 2016, although she was actually present at the NSOC that day for a little less than three hours, between 11:15 a.m. and 2:10 p.m. However, InfoTek's Facebook page included a posting indicating that InfoTeK was participating in another hiring event on August 11, 2016 at the Tyson's Corner Ritz-Carlton in McLean, Virginia that was accompanied by the following caption: "Hope to see you there! #IT Jobs #ClearedJobs #NowHiring #ClearenceJobs [sic]" (copy attached).

52.     For Tuesday, November 8, 2016, InfoTeK's monthly bill to the NSA included 8 hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, there was no record of Ms. Kimmel accessing the designated NSA facility through her access control card on that date at all. Your Affiant reviewed the public portions of InfoTeK's Facebook page and observed that on November 8, 2016, InfoTeK's Facebook account shared a link to a photograph from another Facebook user along with an advertisement for a happy hour on November 8, 2016 at an establishment called Jailbreak in Annapolis, Maryland. This establishment wrote the following caption with the photograph: "Thanks to InfoTeK Corporation we will be opening a bit earlier for our Election day viewing! They have sponsored $4 pints until 6:30 and happy hour pints for the rest of the night!"

53.     For Thursday, January 12, 2017, InfoTeK's monthly bill to the NSA included 8 hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, her access control card records established that she was present in a NSA facility in Georgia for a total of 2 hours 41 minutes (between 10:23 a.m. and 2:07 p.m., with two gaps in that period totaling 61 minutes) resulting in a billing discrepancy of at least 4.25 hours (and the

IRONBRIDGE contract had no connection to Georgia, although InfoTeK's other NSA contract did).  Your Affiant reviewed the public portions of InfoTeK's Facebook page and saw a January 11, 2017 post that stated: "Hello Georgia! Join InfoTeK Thursday, January 12 from 4 to 7 p.m. at the Arsenal Tap Room + Kitchen in Augusta.  We are hosting a Meet & Greet Happy Hour for anyone in the area supporting the local commands" (copy attached).

54.     For Thursday, February 23, 2017, InfoTeK's monthly bill to the NSA included 8 hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, her access control card records indicated that she never entered nor exited the NSA facility where the NSOC was located at all on that day.  However, your Affiant viewed the public portions of InfoTeK's Facebook page and observed a February 23, 2017 post that stated: "Another great AFCEA Central Maryland (CMD) luncheon today.  Outstanding presentation by #DCI and amazing insight from @Natalie Laing, NSA Chief of Staff, on largest scale change. #AFCEA".  Your Affiant understands AFCEA to be an industry organization whose acronym stands for "Armed Forces Communications & Electronics Association" and that has regional and local chapters all across the United States.

55.     For Wednesday, June 14, 2017, InfoTeK's monthly bill to the NSA included 8 hours for time purportedly worked by Ms. Kimmel on the IRONBRIDGE contract; however, Ms. Kimmel's control card access records indicated that she never entered nor exited a NSA facility on this day.  Furthermore, your Affiant saw a post from June 14, 2017 on InfoTeK's Facebook page that announced a happy hour event, hosted by InfoTeK, in Augusta, Georgia at the Arsenal Tap Room on that same day from 4 p.m. to 8 p.m. (copy attached).

56.     After the investigators completed their initial comparison of Ms. Kimmel's access control records with InfoTek's monthly billings on the IRONBRIDGE contract, Ms. Kimmel was asked to report to the NSA OIG's offices for an interview in early October 2017.  After she

was shown the material collected by the NSA OIG investigators up to that point, Ms. Kimmel acknowledged that her time had been inaccurately billed in some of the instances identified by the complainant, while in others she claimed that she had in fact billed at least part or all of the hours submitted, even though she was out of town visiting friends, attending her high school reunion, or dealing with matters related to other contracts held by InfoTeK.

57.     At this interview on October 3, 2017, with regard to her time-keeping practices, Ms. Kimmel further acknowledged that "I have to fill it out every day" (Transcript at 27), and that "it's the billable hours that are the important hours, that I have them accurate and I have them right on there" (*Id.*). At page 30, she again confirmed that she filled out her time card every day, and at page 32, she claimed that "I monitor my time throughout the day on what I'm doing for Ironbridge and what's against Ironbridge . . . ." This was consistent with the provisions of InfoTeK's employee manual at this time, which provided that:

> Each Program Manager is responsible for tracking all time for all nonexempt and exempt employees. Timekeeping records must be maintained accurately at all times. Employees are expected to maintain their time daily in the timekeeping system.

58.     Following this interview, Ms. Kimmel's then-counsel advised the government that there had been an intrusion into InfoTeK's computerized personnel records system in July 2017 that resulted in alterations to the Paid Time Off (PTO) totals of a number of employees. Her then-counsel suggested that there may have been other intrusions during which the time billed by Ms. Kimmel on the IRONBRIDGE contract was altered without her knowledge. In response to requests by government investigators, however, InfoTeK's counsel has subsequently been unable to present any evidence supporting this suggestion that Ms. Kimmel's reported time that was billed on the IRONBRIDGE contract had been altered, whether on the date of that intrusion or otherwise.

23

59.     A forensic analysis conducted by an outside firm subsequently retained by InfoTeK did establish that the July 2017 intrusion and the alterations to some employees' paid time off and other items that were made on that occasion was carried out from an IP address associated with the company's former Chief Financial Officer (CFO) Dwayne Preston, who left the company in March 2017.  Mr. Preston has since acknowledged to government investigators that he was responsible for the intrusion, which lasted about 40 minutes.  He has informed the investigators he did this because he was angry after his wife, who also worked for InfoTeK, was abruptly terminated by Ms. Kimmel two-and-a-half weeks earlier as their family was about to leave on vacation.  While Ms. Kimmel has suggested to investigators that Preston may have also increased the number of hours attributed to her and billed on the IRONBRIDGE contract without her knowledge on other occasions, she has produced no evidence to support that this occurred. Moreover, Preston had no apparent motive to do so prior to the time he left the company in March 2017 and his wife was fired at the end of June 2017.  In addition, because billing and payment for InfoTeK's services occurred on a monthly basis, Preston would have had no ability in the spring or summer of 2017 to reach back into the past and adjust Ms. Kimmel's previously recorded hours and time billed to the NSA prior to March 2017.  In addition, all of the apparently fraudulent billings on particular dates identified by the anonymous complainant's letter occurred between May and August 2017, after former CFO Preston had left his employment with InfoTeK.

60.     Throughout this period between mid-March 2016 and the fall of 2017 when she is suspected of having fraudulently overbilled the NSA for her work as the Senior Program Manager on the IRONBRIDGE contract, Ms. Kimmel was InfoTeK's CEO and President, with responsibilities that included overseeing the company's performance of another major contract with the NSA as well as general administrative and marketing responsibilities and working on

24

the development of at least two other projects that she hoped would generate additional business opportunities for InfoTeK.

61.     On or about December 21, 2020, Facebook responded to a subpoena issued by the Grand Jury for the District of Maryland and provided basic subscriber information (as defined in 18 U.S.C. § 2703(c)(2)) for the accounts identified in Attachment A, indicating they were, in fact, subscribed to by Jacky Kimmel and by InfoTeK.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

62.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

63.     Based on the facts set forth above, I submit there is probable cause to believe that fraudulent claims involving the hours worked by Ms. Kimmel as program manager on the IRONBRIDGE contract in 2016-17 were submitted or caused to be submitted to the NSA by InfoTeK and Ms. Kimmel in violation of 18 U.S.C. §§ 287 and 1001, and that evidence of these crimes will be found in the social media accounts described above and in Attachment A. Accordingly, I ask that the Court issue the requested search warrant.

64.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, whose personnel

will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

65.     Pursuant to 18 U.S.C. § 2703(b)(1)(A), notice to the subscriber of such disclosure pursuant to a warrant is not required. In addition, §§ 2703(c)(1)(A) and (c)(2) provide that, in addition to the contents of electronic communications, the government may obtain by means of a search warrant any remaining types of records and information, such as computer logs and subscriber information, pertaining to a subscriber of an electronic communication service or remote computing service.  Section 2703(c)(3) further provides that under such circumstances, no notice to the subscriber or customer is required.

66.     Your Affiant signed this document under oath as to all assertions and allegations contained herein and submits that its content are true and correct to the best of my knowledge.

CHOI.EUGENE.H.125
4573805

Digitally signed by
CHOI.EUGENE.H.1254573805
Date: 2021.03.05 13:45:26 -05'00'

Eugene H. Choi, Special Agent
Defense Criminal Investigative Service (DCIS)

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___8___ day of _March_, 2021.

THE HONORABLE THOMAS M. DIGIROLAMO
UNITED STATES MAGISTRATE JUDGE

1:21-mj-654 TMD





1:21-mj-654 TMD





1:21-mj-654 TMD



## ATTACHMENT A

### Property to Be Searched

This warrant seeks to search accounts controlled by the free, web-based social media service provider known as Facebook, Inc. ("Facebook"), headquartered at 1601 Willow Road, Menlo Park, CA 94025.  The accounts to be searched are:

a.   **TARGET FACEBOOK ACCOUNT 1**: Facebook User ID Number 1442451281 with Facebook Username Jacky Kimmel or Jacky McComber; and

b.   **TARGET FACEBOOK ACCOUNT 2**: Facebook User ID Number 233600273346186 with Facebook Username InfoTeK, Incorporated.

The information associated with these accounts are stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

## **ATTACHMENT B**

### **Particular Things to be Seized**

I.     **Information to be Disclosed by Facebook, Inc. (the "Provider"):**

To the extent that the information described herein is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the user IDs listed in Attachment A for the period from the date of account creation to the present, unless otherwise specified below:

(a)     All contact and personal identifying information, for the above Facebook IDs, including full name, alternate name and name changes, user identification number, birth date, gender, physical address or addresses (including city, state, and zip code), contact e-mail addresses, Facebook passwords, Facebook security questions and answers, telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the accounts and all other documents showing the user's posts and other Facebook activities for the period from **March 14, 2016 through September 8, 2017.**

(c)     All photos and videos uploaded by those user IDs and the known account users, and all photos and videos uploaded by any user that have those user IDs tagged in them for the period from **March 14, 2016 through September 8, 2017**, including any metadata associated with those photos and videos;

(d)     All profile information; news feed information, including posts by the known users or account holders; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists and friend requests, including the friends' Facebook user identification numbers; rejected "Friend" requests; groups and networks of which the user is a member,

28

including the groups' Facebook group identification numbers; future and past events postings; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications, for the period from **March 14, 2016 through September 8, 2017**;

(e)     All other records of communications and messages sent or received by the user from **March 14, 2016 through September 8, 2017**, including all Messenger activity, content of and information about private messages, chat history, video and voice calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information for the period from **March 14, 2016 through September 8, 2017**;

(g)     All IP logs, including all logins/logouts and records of the IP addresses that logged into the account for the period from **March 14, 2016 through September 8, 2017**;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts, all non-Facebook webpages and content that the user has "liked" during the period from **March 14, 2016 through September 8, 2017**;

(i)     Chat history for the period from **March 14, 2016 through September 8, 2017**;

(j)     Any information that the users have hidden from their news feeds;

(k)     Any shares or status updates for the period from **March 14, 2016 through September 8, 2017**;

(l)     Linked accounts and screen names;

(m)     Notification settings, privacy settings, recent activities;

(n)     All records of Facebook searches performed by the account for the period from **March 14, 2016 through September 8, 2017**;

(o)     The types of service utilized by the user;

29

(p)     Account status history, including the length of service, any activation, deactivation dates, and the means and source of any payments associated with the service (including any credit card or bank account number);

(q)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(r)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken, for the period from **March 14, 2016 through the present**.

Facebook is hereby ordered to disclose the above information to the government within **14 days** of the issuance of this warrant.

## II.     Information to be Seized by the Government:

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 287 and 1001, including but not limited to, for the user IDs or account holders identified in Attachment A, information pertaining to the following matters:

(a)     information relating to the physical location or whereabouts of Jacky Lynn Kimmel (McComber), a known user of the subject accounts, for the period from **March 14, 2016 through September 8, 2017;**

(b)     information relating to how and when each of the identified Facebook accounts was accessed or used for the period from **March 14, 2016 through September 8, 2017**, to determine the chronological and geographic context of the account access, use, and events relating to the crime under investigation and to the Facebook account owners;

30

(c)      records of communication with other individuals concerning the physical whereabouts and activities of Jacky Lynn Kimmel (McComber) for the period from **March 14, 2016 through September 8, 2017**, and of the submission of false claims to the NSA and related false statements in connection with the IRONBRIDGE contract;

(b)      information pertaining to the solicitation and/or identification of co-conspirators and/or facilitators involved or associated with, and others involved in the submission of false claims to the NSA and related false statements, in connection with the IRONBRIDGE contract;

(c)      information relating to substantial purchases or costs incurred by Jacky Lynn Kimmel (McComber) with regard to items such as automobiles, boats, vacations, real or other personal property for the period from **March 14, 2016 through September 8, 2017**;

(e)      records indicating that data has been deleted by the account owner, possibly for the purpose of hiding evidence of a crime, during the period from **March 14, 2016 through the present**;

(f)      evidence indicating how and when the accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to Jacky Lynn Kimmel (McComber), for the period from **March 14, 2016 through September 8, 2017**;

(g)      evidence indicating the state of mind of Jacky Lynn Kimmel (McComber) and any other individuals with whom she had communications as it relates to the crime under investigation during the period from **March 14, 2016 through the present**;

(h)      the identity of the person(s) who created or used the user IDs;

(i)      the identity of any person(s) who communicated using the user IDs about matters relating to fraudulent claims and false statements involving or relating to time-and-attendance fraud that were submitted or caused to be submitted to the NSA by InfoTeK and Ms. Kimmel, or

31

to false statements that were made by Ms. Kimmel to government investigators, in violation of 18 U.S.C. §§ 287 and 1001, during the period from **March 14, 2016 through the present;**

(k)     any other evidence relating to violations of 18 U.S.C. §§ 287 and 1001.

## GOVERNMENT PROCEDURES FOR WARRANT EXECUTION

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.

If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

1:21-mj-654 TMD

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11) (Facebook)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, Inc. and my official title is _____. I am a custodian of records for Facebook, Inc. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, Inc., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Facebook Inc.; and

c.      such records were made by Facebook, Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____          _____
Date                                            Signature

33